

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

DCP:MPR
F. #2019R00927

*271 Cadman Plaza East
Brooklyn, New York 11201*

April 23, 2021

<u>By ECF</u>

The Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Richard Dale Sterritt, Jr.
       <u>Criminal Docket No. 21-193 (KAM) (E.D.N.Y.)</u>

Dear Judge Matsumoto:

   The government respectfully submits this letter in support of its motion for a permanent order of detention for the defendant Richard Dale Sterritt, Jr. ("Sterritt"), also known as "Richard Richman." Sterritt was arrested on April 14, 2021 in Dallas, Texas and has been detained since that time. On April 21, 2021, the Honorable Renee M. Toliver, United States Magistrate Judge for the Northern District of Texas held a detention hearing for the defendant. Following the testimony of Special Agent Jennifer Riker of the Federal Bureau of Investigation (the "FBI), Judge Toliver found the defendant to be a danger to the community but ordered him released because she found that the defendant was not a risk of flight. Judge Toliver imposed several conditions of release but did not require a secured bond, any suretors to sign the bond or require the defendant to post money or property to secure the bond. For the reasons set forth below, the government respectfully submits that Judge Toliver's decision should be overruled because it is based on a misunderstanding of the law and the conditions of release will not ensure the defendant's appearance in this Court and the safety of the community.

I.  <u>Background</u>[1]

   Sterritt was the architect of multimillion-dollar fraud schemes. He and his co-conspirators raised more than $16 million for a failing oil and gas company, Zona Energy, Inc.,

---

   [1] Although the testimony of Special Agent Riker at the detention hearing established ample evidence for the Court to order the defendant detained, the government is

much of which he and his co-conspirators misappropriated for luxury cars, plastic surgery, and investments in other companies Sterritt controlled, such as a cannabis company. To cover up the offering fraud, Sterritt and his co-conspirators engaged in a pump-and-dump scheme, in which they attempted to manipulate the stock of a shell company Sterritt secretly controlled with an undercover FBI agent, whom they believed was a crooked broker. Sterritt and his co-conspirators also laundered their criminal proceeds, to further conceal and promote their fraudulent schemes.

A. The Fraudulent Schemes

As set forth in more detail in the indictment, see Ex. A. at ¶¶ 1-81, the FBI has been conducting an investigation into several fraudulent schemes engaged in by Sterritt and his coconspirators, designed to defraud investors in Zona Energy, Inc. ("Zona Energy"), OrgHarvest Inc. ("ORGH") and other companies.

Sterritt is the undisclosed control person of multiple entities related to the fraudulent schemes discussed below, including Zona Energy and ORGH. In or about April 2003, Sterritt was convicted in the United States District Court for the Northern District of Texas of conspiracy to commit securities fraud, money laundering, and filing false income tax returns and was sentenced to 5 years.

In or about and between March 2018 and January 2021, Sterritt and his co-conspirators engaged in a series of related fraudulent schemes in which they agreed to: (a) engage in an offering fraud in the securities of Zona Energy (the "Zona Energy Offering Fraud"); (b) the market manipulation of publicly traded shares of ORGH stock (the "ORGH Market Manipulation," together with the Zona Energy Offering Fraud, the "Fraudulent Schemes")); and (c) launder money by facilitating financial transactions to conceal and promote the Fraudulent Schemes and which transactions involved proceeds of fraud in the sale of securities.

Specifically, between March 2018 and January 2021, Sterritt and others engaged in the Zona Energy Offering Fraud. Through that scheme, they raised approximately $16 million in investor funds through the sale of shares of Zona Energy and then through the sale shares in an entity Sterritt secretly controlled called ERF Wireless ("ERFB"). While raising funds, Sterritt and others made a series of misrepresentations and omissions regarding, inter alia, Zona Energy's performance and Sterritt's background and involvement in Zona Energy.

---

permitted by the Second Circuit, to supplement the evidence through a factual proffer in support of its motion for a permanent order of detention. See infra Section II; United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000); United States v. Ferranti, 66 F. 3d 540, 542 (2d Cir. 1995). As the testimony of Special Agent Riker and any proffered evidence seek only to articulate facts sufficient to justify detention, that evidence is not a complete statement of all of the evidence of which the government is aware or will seek to introduce at trial.

Sterritt and others then misappropriated the proceeds of the Zona Energy offering by spending millions of dollars on luxury items, paying personal expenses and putting funds into unrelated business endeavors.

From February 2020 through June 2020, Sterritt and others engaged in the ORGH Market Manipulation, a pump-and-dump scheme involving ORGH stock. Sterritt and others engaged in matched trading to artificially prop up the price of ORGH shares through an FBI undercover agent ("UC"), whom they believed controlled a team of crooked brokers. As Sterritt admitted to the UC, he secretly controlled the majority of ORGH stock through entities in the names of his friends and family members. (Transcript of April 21, 2021 Detention Hearing ("Tr.") 8-9, attached hereto as Exhibit B). The UC and his/her team of brokers were to inflate the price of ORGH stock and place the stock in their customers' accounts. (Tr. 8). The defendant told the UC that he ultimately wanted to trade between 40 and 50 million shares at a manipulated price of $2 per share, which would place between $80 and $100 million of inflated shares in the accounts of the UC's purported clients/victims. (Tr. 9-10). The defendant also agreed to pay the UC a kickback of 35 percent of the amount of stock that was subject to the matched trading and further came up with a series of false cover stories to cover up the true reason behind the kickback payment, including hiring the UC as a marketing consultant for his cannabis company or as payment for masks during the COVID-19 pandemic. (Tr. 11-12). In May 2021, the defendant and his co-conspirators placed eight smaller matched trades with the UC; trades that they believed to be "test" trades to ensure the matched trading system worked properly. Before the defendant could move on to the larger trades, the Securities and Exchange Commission (the "SEC") shut down trading in ORGH stock.

From March 2018 to January 2021, Sterritt and others laundered the proceeds of the Fraudulent Schemes by transferring investor funds through a series of bank accounts that he and others, including his co-defendants Straza and Greer, controlled in order to conceal the source of the funds and promote the fraudulent schemes.

Throughout the course of the investigation, an FBI Confidential Source ("CS#1") and the UC have recorded hundreds of phone calls, text messages and in-person conversations with Sterritt, during which Sterritt discussed his participation in the Fraudulent Schemes and his efforts to cover his tracks.[2] In particular, Sterritt was recorded detailing his secret control over ORGH stock to the UC, agreeing to pay the UC the kickback, contemplating

---

[2] CS#1 is cooperating with the government in exchange for monetary compensation. CS#1 previously pleaded guilty to one count of conspiracy to commit securities fraud and, in a separate fraud scheme, pleaded guilty to one count of conspiracy to commit securities fraud, wire fraud and mail fraud. CS#1 was sentenced to a term of imprisonment, followed by supervised release. CS#1's information has been reliable, and it has been corroborated by consensually recorded communications and other evidence.

false reasons to cover up the kickback, agreeing to the specific price, volume and time of the matched trading and discussing using "burner" cell phones.

  B. <u>Sterritt's History of Serial Fraud</u>

  Sterritt has a demonstrated history of engaging in one fraudulent scheme after another. As noted above, in 2003, prior to engaging in the Fraudulent Schemes, Sterritt previously was convicted in federal court for engaging in a similar market manipulation scheme as the ORGH Market Manipulation scheme. As part of his guilty plea, in 2003, the defendant admitted to manipulating the stock of a publicly traded company by transferring stock among different entities he secretly controlled to create the appearance that the stock was trading in large volumes. (Tr. 7). The defendant secretly controlled the various entities in the fraud by arranging for ownership of the entities to be placed in trusts for relatives and close friends. Following his guilty plea, the court sentenced him to five years' imprisonment and three years of supervised release. (Tr. 7)

  The defendant's prison sentence in the prior case did nothing to stop his criminal conduct. Both the Zona Energy Scheme and the ORGH Market Manipulation Scheme were both designed to, and did in fact, harm actual investors. Moreover, as noted above, the ORGH Market Manipulation Scheme was very similar to the scheme underlying the defendant's 2003 conviction. In both schemes, the defendant manipulated the price and volume of a publicly traded company under his control using shares placed in entities and trusts secretly controlled by his family. It is thus clear that Sterritt was not deterred from committing criminal conduct by his prior conviction, including using his old playbook of frauds to manipulate the market yet again.

  Perhaps even more disturbingly, the defendant has shown a steadfast commitment to continue his criminal conduct even in the face of regulatory intervention. For example, on June 1, 2020, the SEC halted trading in ORGH securities for a period of ten days to stop Sterritt from defrauding investors through the ORGH Market Manipulation. (Tr. 13). Yet, on June 8, 2020, Sterritt obtained a new burner phone to communicate with the UC, in an attempt to evade law enforcement. The following day, Sterritt pivoted to his next fraud, beginning conversations with the UC about engaging in private placements/stock purchase agreements for ERFB, another company Sterritt secretly controlled, and he also discussed engaging in another pump-and-dump using ERFB. The defendant told the UC that he wanted to increase the price of ERFB, that he would be doing the matched trading and again agreed to pay the UC a 35 percent kickback for placing the inflated shares with his client. (Tr. 13-14).

  On February 3, 2021, the SEC suspended trading for a period of ten days in ERFB securities in an attempt to prevent Sterritt from defrauding investors. Sterritt was again not deterred by the SEC's intervention. Just five days later, Sterritt asked CS#1 to help him raise an additional $300,000 to $500,000 for his next scheme. Over the following six weeks, Sterritt engaged in multiple phone calls with CS#1 about his plans to raise money to get his

next scheme off the ground. Accordingly, Sterritt has engaged in a clear pattern of fraud that can only be stopped if he is detained pending trial.

Sterritt's conduct throughout the criminal scheme provides clear evidence that he intends to commit frauds and will take any step necessary to prevent the fraud from being detected. Sterritt hid his true identity from investors and potential investors in both schemes. Sterritt went by the alias "Richard Richman" in an attempt to shield his criminal past from investors. In November 2019, a former Zona Energy employee revealed Sterritt's true identity and criminal history to some investors in Zona Energy. When questioned about that revelation, Sterritt made further misrepresentations about his background.

Moreover, he also has shown that he knows how to conceal his fraud, through the use of burner phones, phones in other persons' names and encrypted devices, all of which he used to communicate with CS#1 and the UC. The defendant discussed sending the UC a "crypto phone," a phone that had a level of encryption where conversations could not be recorded, to use as part of their schemes. While Sterritt did not send a crypto phone to the UC, law enforcement agents did recover one from his residence when they executed a search warrant there at the time of the defendant's arrest. (Tr. 16). The defendant also discussed with a co-defendant disposing of the phones they used in the ORGH Market Manipulation Scheme, by throwing them in the East River of New York. (Tr. 17).

Finally, the defendant has admitted to using untraceable phones to evade supervision. In a recorded call, the defendant admitted to using phones in other people's names while on supervised release for his 2003 conviction because he was not allowed to have a phone and did not want his probation officer to know about his cellular phone. (Tr. 17).

C. Sterritt's Risk of Flight

The evidence also establishes that Sterritt poses a significant risk of flight if he is released. For instance, Sterritt engaged in multiple recorded conversations with CS#1 in which he plotted to live abroad and commit his crimes beyond the reach of U.S. authorities. For instance, on April 29, 2020, Sterritt and CS#1 engaged in a conversation about purchasing a yacht, on which they would be able to engage in the Fraudulent Schemes from international waters. During the conversation, Sterritt stated: "[W]e could actually run it all off of a yacht and leave it right there and then get off the yacht and go somewhere else . . . . Everything off 170 feet is in international waters, man. They can't f***king do shit." (Tr. 18).

Subsequently, Sterritt informed CS#1 that he was looking into purchasing a yacht for that purpose. Sterritt told CS#1 that he planned to have a "boat here and in, in, in Monte Carlo at the same time." He explained his plan, stating: "[W]e'd be on a boat, 'Hey [CS#1], would mind going in and putting, hitting bids? I, I want to sell like, 50,000 shares in all 10 deals."

5

Later, on November 30, 2020, Sterritt spoke to the UC about his connections to Costa Rica. He further explained that he used to "own three casinos down there" and that he was thinking of going there because he had "some friends" there. Sterritt proposed meeting with the UC in Costa Rica to discuss a joint venture. (Tr. 19). On December 1, 2020, Sterritt told CS#1, "I'm running around trying to get my passport because my fucking passport was expired."[3] He then told CS#1 that he planned to go to Costa Rica.

Finally, the defendant's resources are unclear, providing him with a potential means to flee. Although the defendant claimed, to Pretrial Services and at the hearing through counsel, to be without funds, as Special Agent Riker testified, the more than $10 million in investor funds were misappropriate through the Fraudulent Schemes. (Tr. 20-21). The defendant was the one who directed the dispersal of those funds through multiple accounts in the names of other individuals. Although the FBI has traced some of those funds, not all of the money that was withdrawn from the accounts can be traced being deposited into other accounts and large amounts of cash were withdrawn or provided to the defendant's girlfriends or their families. (Tr. 21-22). In addition, the defendant has stated on recorded calls that he had no bank accounts in his name, so it is not possible to identify all of the funds sent to or maintained by the defendant.

D. The Detention Hearing

On April 21, 2021, Special Agent Riker testified on direct and cross examination and Judge Toliver asked additional questions, primarily related to the defendant's ability to engage in criminal conduct simply by using a telephone and the defendant's lifestyle. (Tr. 36-9).

Following argument, Judge Toliver found that there was "sufficient evidence of a risk of danger," a finding that "concern[ed] her. However, she denied the government's motion for detention because she "unfortunately" did not find a serious risk that the defendant would flee. (Tr. 55). On multiple occasions, Judge Toliver stated that "the primary conditional question" she needed to answer was whether she had evidence that the defendant would flee. (Tr. 43-44 ("your basis for detention, the thing that gives you the opportunity to ask for detention is risk of flight"); Tr. 55 ("[a]nd so, then, the difficulty for me is that if I can't find that there's a serious risk that a defendant will flee, I don't even get to the other issues of whether he poses a danger or risk of flight."); id. ("[b]ut I didn't hear significant evidence that there's a serious risk that the defendant would flee, which is, again, the primary conditional question that I have to answer.")). As a result, Judge Tolvier stated:

---

[3] The exact status of the defendant's passport is unclear. Although the defendant claimed in recorded phone calls that his passport is expired, he told Pretrial Service in Texas that he had a passport.

6

> Again, I don't know if it will prevent the kind of financial harm, which I agree, other courts agree, are a danger to the community, but certainly I believe will reasonably assure that Mr. Sterritt is available for and attends his criminal proceedings in the District of New York, Eastern District of New York.

(Tr. 56).

Judge Toliver then ordered the defendant's release on certain conditions. Judge Toliver order release on an unsecured personal recognizance bond, without any suretors or the posting of any property. Instead, the conditions Judge Toliver imposed were:

- Not to violate state or local law;
- Advising Pretrial Services of a change in address or phone number;
- Appear in Court as required;
- Serve a custodial sentence;
- Submit to supervision by Pretrial Services;
- Surrender his passport and not apply for a new passport;
- Travel restricted to the Northern District of Texas and Eastern District of New York;
- Avoiding contact with victims, co-defendants and unidentified co-conspirators
- Not possessing a firearm;
- No involvement in securities or stock trading;
- Restrictions on use of telephones, other than to speak with attorneys or for emergencies; and
- Home confinement with electronic GPS monitoring

(Tr. 57-60). Although Judge Toliver recognized that the restrictions on telephone usage would be "next to impossible to enforce," she imposed it at the government's request. (Tr. 60-2). Judge Toliver stayed the defendant's release pending this appeal of her decision and has required the government to notify her by 3:00 p.m. on Friday if it intends to appeal, an order with which the government has complied.

II. The Court Should Enter a Permanent Order of Detention

A. Legal Standard

A district court reviews de novo a magistrate judge's decision to release or detain a defendant pending trial. See United States v. Esposito, 309 F.Supp.3d 24, 30 (S.D.N.Y. 2018) (Marrero, J.) (citing United States v. Leon, 766 F.2d 77, 80 (2d Cir 1985)). A district court undertakes a two-step inquiry when evaluating an application for bail. See 18 U.S.C. § 3142(e). First, the Court must determine whether the Government has established the defendant presents a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (emphasis added). Second, if the Government meets its initial burden, the Court must

7

determine whether no conditions or combination of conditions of release could reasonably assure the defendant will not flee or will not endanger others. See United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007). In making that determination, a court must consider four factors in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See id. § 3142(g).

The Government must support a finding of dangerousness by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). A finding of risk of flight must only be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); see also United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

B. Argument

i. The Magistrate Court Applied the Incorrect Legal Standard

As noted above, Judge Toliver incorrectly concluded that her finding of dangerousness was an insufficient basis on which to order the defendant detained. (See Tr. 55). To the contrary, as noted above, the documented danger the defendant poses to the community provides an independent and sufficient basis to order the defendant detained. There is simply no threshold requirement that the court must find a defendant is a flight risk, before detaining the defendant as a danger to the community. See United States v. Mattis, 963 F.3d 285, 290 (2d Cir. 2020) ("A district court is instructed to order the pre-trial detention of a defendant if, after a hearing, the judge 'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'") (emphasis added) (citing 18 U.S.C. § 3142 (e)(1)). That state of the law makes perfect sense. Under Judge Toliver's reasoning, even if a defendant had been accused of a litany of violent crimes, including murder, he or she could not be detained unless the government could first demonstrate that the defendant also presents a risk of flight.

Indeed, the applicable law is clear that, if the defendant presents a danger to the community, he or she can be detained unless there is a condition or combination of conditions that will reasonably ensure the safety of the community. As discussed further below, Judge Toliver found that the defendant presents a danger to the community and that the conditions she imposed were insufficient to protect against that danger. Accordingly, under the law, Judge Toliver should have detained the defendant.

ii. The Defendant Poses a Danger to the Community

As recognized by Judge Toliver, the government has demonstrated, by clear and convincing evidence, that the defendant presents a danger to the community. The evidence

8

has established that the defendant is a serial fraudster, who has shown that he cannot be deterred by law enforcement and/or regulatory action. The defendant previously served five years' imprisonment for engaging in a fraudulent scheme that is very similar to one of those charged in this case. Yet, following his stint in federal prison, he went back to a life of fraud. By 2018, he was engaged in the multimillion-dollar Fraudulent Schemes; over the next three years, he misappropriated millions of dollars of investor funds for his own personal gain. Even when the SEC twice tried to prevent Sterritt from further harming investors by suspending trading in his companies' securities, Sterritt immediately began scheming again. Within days of each trading suspension, he was caught on tape trying to come up with next way to scam investors through other market manipulation schemes. As Judge Toliver noted these circumstances easily demonstrate that the defendant poses a continuing danger to the community and the investing public. See (Tr. at 55, noting that the risk of danger posed by the defendant "concern[ed] [her]"); see also United States v. Dupree, 833 F. Supp. 2d 241, 245 (E.D.N.Y. 2011) (affirming order detaining defendant originally based, in part, on financial danger posed by defendant.)

The defendant has also demonstrated that he will take significant steps to conceal his fraud, including from those tasked with supervising him. The defendant used a false identity to perpetrate his schemes, has used burner cell phones in other people's names and discussed destroying evidence. Most importantly, the defendant admitted that he has already taken measures to evade directives and monitoring by the Probation officer in his past conviction when he obtained cell phones in the names of other people in direct contravention of orders of his Probation Officer. (See Tr. 17).

Thus, the Court should detain the defendant because he is a danger to the community. If he is not detained, Sterritt poses a significant danger, because he likely will engage in additional fraudulent schemes and efforts to thwart law enforcement detection. See United States v. Nicolo, 706 F. Supp. 2d 330, 335 (W.D.N.Y. 2010) (finding that defendant was danger to the community, because of his propensity to endanger the economic interests of others within the community) (citing United States v. Kimoto, No. 07-CR-30089-MJR, 2008 WL 4516315, at *4 (S.D. Ill. Oct. 6, 2008)).

As Judge Toliver noted, the defendant has continued to commit fraud despite federal prison and regulatory action. There is no reason to think that he will stop now and adhere to court-imposed release conditions in this case. Thus, because of the risk that he will continue to harm others through his fraud, the Court should detain him.

      iii.    The Defendant Poses a Risk of Flight

Although Judge Toliver did not find a significant risk of flight, the government respectfully submits that it has demonstrated, by a preponderance of the evidence, that the defendant poses a significant risk of flight.

9

The defendant faces a maximum sentence of 20 years' imprisonment on Counts Two through Five of the indictment. Moreover, assuming he falls within a Criminal History Category 2, the government's preliminary Guidelines estimate for the charged crimes is 97-121 months. As noted above, the evidence supporting these serious charges is strong, including the testimony of CS#1 and the UC, as well as voluminous recorded phone conversations and text messages between Sterritt, CS#1, the UC, and Sterritt's co-conspirators, as well as in-person meetings between Sterritt, CS#1 and Sterritt's co-conspirators. Given the significant jail time the defendant faces upon conviction, he has a strong incentive to flee the jurisdiction. See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms of 105 years' imprisonment created potent incentives to flee); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) ("possibility of a severe sentence" heightens the risk of flight).

Moreover, the government also established that the defendant has the means and international connections to flee. The defendant has misappropriated millions of dollars in investor funds since 2018, and he has demonstrated his ability to thwart law enforcement detection through the use of multiple phones, burner phones and encrypted devices. See United States v. Zarrab, 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (citing defendant's "significant wealth and his substantial resources" as another factor that supported detention). In addition, as previously discussed, he has plotted to run his criminal schemes from abroad, and he has indicated that he has connections in Costa Rica, where he planned to go to engage in additional fraud. Thus, given the defendant's incentive and ability to flee, detention is warranted.

Finally, Judge Toliver's proposed use of home detention and/or electronic monitoring in lieu of detention is insufficient here in light of the defendant's risk of flight described above. Such a proposal "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills." United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993); see Zarrab, 2016 WL 3681423, at *10. Here, such an arrangement is inadequate to ensure that this defendant will not flee.

      iv.    The Conditions of Release Ordered by the Magistrate Court are Insufficient

At the detention hearing, the Magistrate Court ordered a series of conditions on the defendant's release designed to ensure the defendant's appearance in Court. But as Judge Toliver specifically noted, they are insufficient to prevent the defendant from continuing to harm the community. The defendant has persistently continued to find new schemes and new ways to defraud investors. He has taken measures to conceal his identity and his communications. For that reason alone, the defendant's danger to the community is an independent basis to detain the defendant, as there is no condition or combination of conditions

that will assure that the defendant will not continue to be an economic and financial threat and take steps to violate the order of his release. See Dupree, 833 F. Supp. 2d at 245.

Moreover, although detention is legally and factually warranted, the conditions imposed do not provide any incentive for the defendant to comply with the terms of his release, including by fleeing the country. The defendant's bond is a completely unsecured personal recognizance bond, without any financially viable suretors with significant moral suasion and is not secured by any property. As the Court is aware, significant financial bail packages are common for defendants who have been charged with similar crimes of this scope and scale. For instance, as the Court is aware, in United States v. Shkreli, 15-CR-637 (E.D.N.Y.), the defendant Evan Greebel was released on a $1 million bond, secured by the defendant's residence and the signature of both his mother and wife as suretors. (Dkt. No. 11). And, unlike the defendant, Greebel did not have a criminal history, a documented past of taking significant measures to evade monitoring or the connections and desire to move to other countries to evade law enforcement. Paradoxically, despite being one of the ringleaders of the Fraudulent Schemes, and the only one with the documented continued danger to the community, the defendant is the only one who was not released on some type of secured bond.

III.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court overrule Judge Toliver's order releasing the defendant and issue a permanent order of detention.

    Respectfully submitted,

    MARK J. LESKO
    Acting United States Attorney

By:    /s/
    David C. Pitluck
    Michael P. Robotti
    Assistant U.S. Attorneys
    (718) 254-7000

cc:    Defense Counsel (by email)